UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ULTRA RECORDS LLC,<br><br>       Plaintiff,<br><br>-against-<br><br>ULTRA INTERNATIONAL MUSIC PUBLISHING,<br><br>       Defendant. | 22-cv-9667 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Plaintiff Ultra Records LLC, an EDM-focused record label, brought this suit against its former corporate sibling, Ultra International Music Publishing. *See* Dkt. 1 ¶ 3. (Consistent with the Court's prior opinions, it refers to Ultra Records as "Records" and Ultra Publishing as "Publishing.") Records says that by continuing to use the "Ultra" name following the two companies' disentanglement, Publishing is violating Records' trademark rights. Records sued Publishing for trademark infringement and unfair competition under federal and state law, trademark dilution under state law, and breach of contract. *See* Dkt. 1 ¶¶ 24-38.

After a jury trial and verdict—largely in Records' favor—the Court held a bench trial on whether Records' claims are subject to equitable estoppel, and if not, the remedies to which Records is entitled. For the following reasons, the Court rejects Publishing's equitable-estoppel defense and enjoins Publishing's use of the Ultra mark, but it denies Records' request to disgorge Publishing's profits.

## BACKGROUND

Before trial, the parties agreed that the jury would decide questions relevant to liability on Records' claims as well as damages on its contract claim. If Records prevailed on liability, the Court would then decide whether those claims are subject to Publishing's equitable-estoppel defense, and if not, whether Records is entitled either to an injunction or disgorgement.

From December 3 to December 10, 2024, the Court held a jury trial. At trial, Records argued that it had impliedly licensed the Ultra mark to Publishing, that it had terminated that license effective March 2022, but that Publishing had continued using the mark thereafter in bad faith. Separately, Records argued that whether or not it licensed the mark, Publishing's use of the Ultra name violated Records' trademark rights based on the *Polaroid* likelihood-of-confusion factors. The jury's findings on these and other related issues would determine Publishing's liability on Records' claims.

The jury came back with a verdict largely in Records' favor, but with key findings for Publishing. It found that Records had in fact licensed the Ultra mark to Publishing for use in the

music-publishing business, and that Publishing's use of the mark after March 2022 was in breach of the license and, for unfair-competition purposes, in bad faith. Relevant to the dilution claim, the jury found that the Ultra mark is distinctive and that use of the Ultra name by Publishing is likely to dilute Records' Ultra trademark. But the jury also found that Publishing's use of the Ultra mark isn't likely to cause confusion among Publishing's customers, and that Records suffered no damage from Publishing's breach of the license. *See* Dkt. 197, Q. 1-7.

Following the jury's verdict, the Court held a bench trial. At the close of the trial, the Court gave the parties a tentative decision, Tr. 1298:4-1307:2, and allowed both sides the opportunity to address the issues raised by the Court in argument and in post-trial submissions. *See* Dkts. 196, 199, 200.

## LEGAL STANDARDS

The Court sets out its findings and conclusions below. The factual findings are by a preponderance of the evidence, *see Wilson v. Calderon*, 367 F. Supp. 3d 192, 195 (S.D.N.Y. 2019), and for ease of comprehension, the Court finds certain additional facts in rendering its conclusions of law, as it applies law to the facts. *ADYB Engineered for Life, Inc. v. EDAN Admin. Servs. (Ireland) Ltd.*, 2024 WL 2125431, at *1 (S.D.N.Y. May 10, 2024).

## FINDINGS OF FACT

Patrick Moxey founded Ultra Records, Inc. (later to become Records) in 1995. *See* Tr. 613:5-6. Records was—and still is—a record label focusing on electronic music.

Moxey founded Publishing nine years later in 2004. Tr. 201:8-10; 613:16-17. Publishing is a music-publishing company. (While there's more to it than just this, in general terms record labels record and promote artists, while publishers own and license song compositions. *See* Tr. 119:14-120:14; 191:17-20; 201:20-203:15.) Moxey owned both Records and Publishing, Tr. 205:4-6, and for a time, the companies functioned as two halves of a whole, sharing office space and employees. Tr. 205:11-22. Publicly, Records and Publishing were jointly described as "Ultra Music": a "record label, publishing house, management company[,] and media platform" all rolled into one. PX-196.

In 2012, things changed. That year, Moxey and Sony Music Entertainment teamed up and turned Records into a joint venture. Tr. 207:16-22. They formed a new LLC (Ultra Records, LLC, the plaintiff in this case) and shared equal control of the company. *See* Tr. 207:16-22; 215:2-6; 613:21-614:7. But while ownership changed, Records' business stayed the same, with Moxey in charge of its day-to-day operations. *See* Tr. 56:22-57:4; 215:7-13. As for Publishing, it wasn't part of the Sony deal, and Moxey retained full ownership and control. *See* Tr. 216:17-22.

The joint venture was governed by an agreement signed in 2012. *See* DX-6. For purposes of this opinion, the most important part of that contract is section 5.8(d), covering the "Ultra Logo and Trademark." *See* DX-6 at 41. It reads:

> (d) SME acknowledges that Ultra International Music Publishing LLC ("**UIMP**") makes use of and, following the Closing Date, will continue to make use of the "Ultra" name in the

corporate names and business activities of the following entities: Ultra Music Publishing Inc., Ultra International Music Publishing LLC, Ultra Music Europe, Ultra Music Publishing Europe and Ultra Music Library. UIMP may continue to use the "Ultra" name only in the foregoing manner and only in connection with its music publishing and music library businesses. In no event will UIMP use the Ultra name in connection with the word "Records". **The Company will, and PM will cause UIMP to, negotiate in good faith in order to enter into a non-exclusive, non-transferrable license that incorporates the provisions of this Section 5.8(d) and such other terms as are appropriate for licenses of a similar nature**.

*Id.* (second emphasis added). The last sentence is key: in 2012, Moxey and Sony agreed that Records (the "Company," co-owned by Moxey and Sony) and Publishing (owned by "PM," that is, Moxey) would "negotiate in good faith" over a license regarding Publishing's use of the "Ultra" name in the music-publishing business.

Unfortunately, that didn't happen. Over the next eight-plus years, neither side made good on the contractual obligation to negotiate a license in good faith. On May 8, 2013, Publishing sent Sony personnel a draft perpetual license to review. PX-27. Sony rejected that proposal. Tr. 533:10-14. After that, as Sony's general counsel Julie Swidler put it, "conversations just ended." Tr. 1176:8-10. Sony never responded with a counterproposal, Tr. 1175:17-1176:1, and Moxey never followed up. Tr. 1230:18-1231:19. Publishing kept on using the "Ultra" name, just as it had when Moxey had full ownership of both companies. Tr. 615:4-7. No one complained.

Over the years, Moxey's relationship with Sony soured. In 2021, they terminated their joint venture and Sony bought Moxey out of Records. Tr. 133:1-134:12. Negotiations about Moxey's buyout lasted six months. Tr. 536:20-22. You'd think that somewhere in that half year, the issue of the license would finally have been resolved. It wasn't. What happened instead was much as what happened before: very little. On September 27, 2021, Publishing and Moxey made the same proposal for a perpetual license that Sony had rejected in 2013. PX-38. Sony once again rejected the request. PX-32 at 3. Sony then proposed an eighteen-month license to Moxey on October 29, 2021. PX-32 at 2. Moxey rejected that. Tr. 316:15-19; 543:3-13. The deal closed anyway on December 20, 2021. PX-39.

Nine days after the 2021 agreement was signed, Records (now owned by Sony) informed Publishing that it was terminating Publishing's license to use the Ultra mark. PX-34. Records gave Publishing until March 29, 2022 to stop using the "Ultra" name. *Id.* Publishing didn't (and still hasn't). *See* Tr. 317:20-318:4. For his part, Moxey testified that he believed Publishing had the right to use the Ultra mark in the music-publishing business. Tr. 311:20-312:4.

## CONCLUSIONS OF LAW

**I. Publishing can't meet the standard for equitable estoppel.**

Publishing argues that Records is equitably estopped from asserting its claims. This is an affirmative defense on which Publishing bears the burden of proof. *See* Fed. R. Civ. P. 8(c)(1); *Helvering v. Brooklyn City R. Co.*, 72 F.2d 274, 275 (2d Cir. 1934) (Hand, J.). On the substance,

3

the parties disagree as to whether federal law or New York law governs, but the standard under both is similar. Publishing can't prevail under either.

"Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).

"Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003) (citations omitted).

Here, Publishing can't show any misrepresentation or concealment, which is fatal under either standard. Publishing argues that in 2012, Records should have communicated to Moxey that "it believe[d] it owned the mark in music publishing services, that it would not divest itself of the asset, or give him a perpetual license." Dkt. 191 at 2-3. Failing to do so, according to Publishing, amounted to concealment of a material fact. *See id.* at 3.

Sony's silence wasn't a concealment because Publishing hasn't shown Sony had a duty to speak. "[A] party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013) (New York law); *see also Kosakow*, 274 F.3d at 725 (same under federal law).

Moxey testified at trial that Sony's then-chairman, Doug Morris, told him that Publishing would remain "untouched" by the 2012 deal. Dkt. 191 at 2 (citing Tr. 349:10-14). Publishing argues that this guarantee from Morris induced Moxey to take the deal; had Moxey known about Sony's actual position regarding the Ultra mark, he wouldn't have agreed to the joint venture. *Id.*

First, the Court has serious doubts about Moxey's credibility on this point. Moxey's "tone, demeanor, and the substance of his testimony [on this issue] revealed more of a careful preparation for trial than a genuine recollection of the facts." *360 N. Rodeo Drive, LP v. Wells Fargo Bank, Nat'l Ass'n*, 2024 WL 4039643, at *3 (S.D.N.Y. Sept. 4, 2024). Publishing failed to present evidence corroborating Morris's alleged guarantee, and as discussed below, the contract's drafting history points in the opposite direction—that the parties had no agreement concerning the precise scope of Publishing's rights. That makes this case unlike ones where the Second Circuit has found silence to give rise to an equitable-estoppel claim. *See Gen. Elec. Cap. Corp. v. Armadora, S.A.*, 37 F.3d 41, 45-46 (2d Cir. 1994) (finding estoppel based on the defendant's silence where the defendant (1) did not correct the plaintiff's communicated, yet incorrect, interpretation and (2) appeared to adopt plaintiff's mistaken interpretation in a letter).

Further, Moxey's testimony is undermined by the 2012 deal's express language. The agreement makes explicit reference to Publishing's rights over the Ultra name, requiring the parties to "negotiate in good faith in order to enter into a non-exclusive, non-transferrable license." DX-6 at 41. And crucially, Section 5.8(d) is forward-looking. Moxey testified at trial that he read and understood Section 5.8(d) before he signed the contract. Tr. 1230:11-17. Contrary to an understanding that Publishing's rights would forever remain untouched, the contract required negotiation over the terms of a license from Records to Publishing.

There's more. Even if there was a misrepresentation or concealment—as opposed to the parties just leaving things in limbo—Publishing can't establish that it reasonably relied on Sony's conduct. The Second Circuit has made clear that reliance is unjustified where the party asserting estoppel "had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means." *In re Becker*, 407 F.3d 89, 99 (2d Cir. 2005) (emphasis omitted) (quoting *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 59 n.10 (1984)).

Nothing stopped Moxey from pinning Sony down on its position as to the license years before this became a federal case. There was no evidence of deception, sharp tactics, or any other efforts to hide the truth from Moxey. Rather, Moxey first raised the issue of Publishing's trademark rights three days before the 2012 deal closed. Tr. 1224:10-22. On December 18, 2012, Moxey's lawyers sent over a draft of the joint-venture agreement with language that would have been consistent with Publishing's ability to use the Ultra mark without restriction. PX-20 at 41. Sony didn't accept that proposal, but rather added language about Records' and Publishing's obligation to negotiate the terms of a non-exclusive, non-transferrable license, leaving its precise terms open and unsettled. PX-22 at 42. That should have raised red flags to Moxey, but the deal closed a day later anyway. When asked about the lack of a signed license when the 2012 deal was signed, Moxey testified, "It didn't bother me." Tr. 1230:18-1231:3. That's not the response one would expect from someone who viewed Sony's position about Publishing's rights as make-or-break. And even if Moxey did see things that way, he could have readily obtained clarification from Sony.

The events following the 2012 deal make even clearer that what happened here isn't the stuff of estoppel. After Records rejected Moxey's initial proposal for a perpetual license in 2013, he could have followed up. In fact, he was contractually required to negotiate and could have required Records and Sony to do the same. He didn't. Instead, Moxey testified that he thought waiting eight years for Sony to make a counterproposal was "everything [he] was supposed to do" so far as the license was concerned. Tr. 1231:23-24. And during either the 2012 or 2021 deals, Moxey could have made the license a sticking point. Again, he didn't. *See* Tr. 1232:22-24. One available explanation for why he signed the deals anyway is the significant amount of money he stood to earn. *See* Tr. 125:19-126:1 (testimony that Moxey received approximately $17 million from the 2012 deal); Tr. 134:17-24 (testimony that Moxey received $112 million from 2021 deal). In any event, it was only after things went south in the aftermath of the 2021 buyout that Moxey found himself trying to clean things up. But again, that isn't the basis for estoppel.

5

## II. Publishing is permanently enjoined from using the Ultra mark.

The next question is the appropriate remedy on Records' claims. As a reminder, the jury found that Records owned the rights to the Ultra mark and licensed its use to Publishing in the music-publishing business. This finding was dispositive on Records' trademark-infringement claims, given that there was no dispute that Records terminated the license effective March 2022, but that Publishing continued to use the Ultra name thereafter.[1] *See* Dkt. 199 at 1 (Publishing not disputing that there was "a finding of infringement"). The jury also made the findings required for liability under New York's anti-dilution statute.

Based on the jury's findings, Records now seeks a permanent injunction requiring Publishing to stop using the Ultra mark. Such relief is available to Records under the Lanham Act, under New York's anti-dilution statute, and under New York contract law. *See* 15 U.S.C. § 1116(a); N.Y. Gen. Bus. Law § 360-l; *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 658 (S.D.N.Y. 2013).

For injunctive relief, a plaintiff must show that "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Diageo N. Am., Inc. v. W.J. Deutsch & Sons Ltd.*, 626 F. Supp. 3d 635, 653 (S.D.N.Y. 2022), *aff'd*, 2024 WL 2712636 (2d Cir. May 28, 2024) (analyzing permanent injunction awarded, in part, on state anti-dilution law under the *eBay* factors).

Some framing before addressing these factors. Publishing hasn't cited a single case where a former licensee continued to use a trademark after its license was terminated (what happened here), and the court denied the licensor a permanent injunction. On the other hand, numerous courts have held the opposite, concluding that "breach of a trademark license agreement usually requires an injunction to prevent wrongful trademark use." *Fresh Del Monte Produce Inc.*, 933 F. Supp. 2d at 660; *Coach, Inc. v. Zhen Zhen Weng*, 2014 WL 2604032, at *20-21 (S.D.N.Y. June 9, 2014) (quoting *Fresh Del Monte* and citing cases); *see also* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:1 (5th ed. 2024) ("A permanent injunction is the usual and normal remedy once

---

[1] The Court also submitted to the jury the question of whether, even if there were no license, Publishing's use of the Ultra mark was likely to confuse its customers under the familiar *Polaroid* factors. Records argued that this finding was unnecessary if the jury reached a verdict in its favor on the license question. *See, e.g., Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, 2018 WL 2012875, at *11 (E.D.N.Y. Apr. 20, 2018) ("[T]he *Polaroid* factors are generally not applicable in cases where a licensee or franchisee continues to use a trademark after its license to do so expires or is otherwise terminated (*i.e.*, where an identical as opposed to a confusingly similar mark is at issue) as well as where a licensee or franchisee exceeds the scope of its license. . . . In these situations, the element of consumer confusion is established as a matter of law." (collecting cases)). Nevertheless, in an abundance of caution, the Court required the jury to answer both questions, just in case the jury's license finding were ever upended.

6

trademark infringement has been found in a final judgment. Consider the alternative. If a court were to permit the infringer to continue its infringing activities, the result would be a judicially imposed compulsory license given to an infringer.").

The *eBay* factors confirm that a permanent injunction is appropriate here. First, Records has demonstrated an irreparable injury. Under the Trademark Modernization Act of 2020, "[a] plaintiff . . . shall be entitled to a rebuttable presumption of irreparable harm upon a finding of [trademark infringement] in the case of a motion for a permanent injunction." 15 U.S.C. § 1116(a). Publishing doesn't dispute that Records is entitled to this presumption based on the jury's findings. *See* Dkt. 199 at 2. And even if Publishing could rebut this presumption as a technical matter, Records nevertheless has demonstrated an irreparable injury.

Publishing points to the jury's findings of no likelihood of confusion with respect to Publishing's consumers and no damages due to Publishing's breach of the license. According to Publishing, these findings indicate that Records hasn't suffered any irreparable injury.[2]

But the Second Circuit has stated that "irreparable injury[] exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark." *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985). Records has presented evidence showing that consumers may see Records and Publishing as related, even if Publishing's consumers aren't confused between the two companies. For instance, Moxey has given interviews where he's been billed as the head of "Ultra Music," PX-175, or Publishing has been referred to as "Ultra's … publishing arm," PX-199. And Publishing has sent out newsletters that simply referred to the two companies as "Ultra." PX-178. This is unsurprising, given that the two companies were corporate siblings for decades. Because of that perceived connection, Publishing's actions affect Records and its reputation in a way that Records—absent an injunction—can't control. This is precisely the kind of injury the *Power Test* Court addressed. *See also Church of Scientology Intern. v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("[I]t is that loss of control which is the very thing that constitutes irreparable harm in the licensing context.").

Separate and apart from this, the jury also found that the Ultra trademark is distinctive, and that use of that mark by Publishing is likely to dilute Records' Ultra trademark. *See, e.g., Deere & Co. v. MTD Prods, Inc.*, 860 F. Supp. 113, 122 (S.D.N.Y. 1994) ("It would be anomalous to say that without relief plaintiff's marks would be diluted and then deny the existence of possible irreparable injury. Dilution is itself an injury which could not be recompensed by money damages." (quoting *Am. Express Co. v. Vibra Approved Lab. Corp.*, 1989 WL 39679, at *10 (S.D.N.Y. Apr. 19, 1989)); *see also* N.Y. Gen. Bus. L. § 360-l ("Likelihood . . . of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . .

---

[2] As stated above, *see supra* note 1, while the Court submitted to the jury the question of likelihood of confusion, courts have held that where a licensee engages in unauthorized use of a mark, "the element of consumer confusion is established as a matter of law." *Mitsubishi Motors*, 2018 WL 2012875, at *11 (citing cases). This is one among many reasons why injunctions are the usual remedy in breached-license cases.

notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.").

Publishing's irreparable-injury cases are off the mark. Neither involved a license and the facts of both were far removed from those at issue here. *See Kohler Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 706-07 (E.D.N.Y. 2018) (denying injunction against defaulting defendant where plaintiff failed to show evidence of loss of control over reputation, loss of goodwill, or confusion); *TRU Kids Inc. v. Zaza R Us*, 2023 WL 9232949, at *9 (E.D.N.Y. Dec. 11, 2023) (finding no basis for default judgment on trademark infringement and related claims given plaintiff sold children's toys while defendants sold "cannabis, pipes, and bongs," rendering analysis an "exercise in absurdity," but nevertheless issuing injunction on anti-dilution claims).

Second, Records doesn't have an adequate remedy at law. "[A] plaintiff has no adequate remedy at law if, absent an injunction, the defendant is likely to continue infringing its intellectual property rights." *Int'l Council of Shopping Ctrs., Inc. v. Glob. Infotech LLC*, 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019); *see also Kelly Toys Holdings, LLC v. alialialiLL Store*, 606 F. Supp. 3d 32, 52 (S.D.N.Y. 2022) (observing that damages are inadequate where "rights holders have shown a potential loss of goodwill and control over their trademarks."). Here, Publishing has continued to use the Ultra mark despite Records' termination of its license and the filing of this lawsuit. And Publishing has made no representation that it will cease using the mark absent an injunction. To the contrary, it has fought tooth and nail to avoid dropping the Ultra name. Given that "the record contains no assurance against defendant's continued violation of [Records' rights]," Records has satisfied this factor. *Montblanc-Simplo GmbH v. Colibri Corp.*, 692 F. Supp. 2d 245, 259 (E.D.N.Y. 2010).

Third, the balance of hardships tilts in Records' favor. Publishing says that a change in name will cause it to incur considerable losses to the goodwill and reputation it has accrued since 2004. But this argument is undercut by Publishing's own evidence. Moxey testified that songwriters sign to Publishing because of *his* reputation, the work of his employees, and the availability of Publishing's studios in several cities. Tr. 1205:15-20. Gone unmentioned in that list is his company's name. *See id.* When asked if the Ultra trademark had any function in Publishing's signing of songwriters, Moxey answered no. *Id.* at 1204:7-13. Publishing's expert witnesses backed up this testimony. The first, who had a deal with Publishing, testified that the Ultra name played no role in his decision to sign. Tr. 629:7-10. And the second testified that a company's name doesn't influence which publisher songwriters decide to sign with. Tr. 716:2-5. The second expert also testified that a publisher's name has no effect on the buying process of streaming services like Spotify and Amazon, who are major customers of music publishers. Tr. 696:4-10; 728:21-729:2. Consistent with Publishing's own case during trial, the company's goodwill and reputation aren't built on its name, but rather on Moxey, the team he has built, and the resources he offers to songwriters.

Publishing also points to two other types of costs it would suffer. The first is the administrative cost of changing Publishing's song registrations with the many organizations that pay or collect royalties. Dkt. 199 at 3-4. The second is the likely reduction in prospective income that rights

organizations allocate based on a publisher's market share. *Id.* at 4. The Court takes these harms seriously. As demonstrated below, the Court has crafted an injunction aimed at minimizing both. If further modifications are warranted, Publishing can seek them from the Court.

Finally, given the Court's discussion above, the public interest weighs in favor of a permanent injunction. Publishing is clinging to the Ultra name even though it forcefully argued throughout this case that the name had nothing to do with the success of its business. And given the jury's findings, Records has a property interest in the use of the Ultra name that the public has an interest in vindicating. *See* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:1 (5th ed. 2024) ("The Supreme Court has long recognized that the right to exclude is an essential element of the property right in a trademark. If the owner of a trademark cannot obtain a court order to stop an instance of proven infringement, then a court would be denying the trademark owner a fundamental benefit of property ownership."); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 647 (Fed. Cir. 2015) (noting in the patent context that "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors"). There's no way in which enforcing Records' rights would undermine the public interest.

### III.  Records is not entitled to disgorgement of Publishing's profits.

Records also seeks disgorgement of Publishing's profits during the period of infringement. *See* 15 U.S.C. § 1117(a). "Such relief is rarely granted and [is] limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that clearly would otherwise have gone to the plaintiff." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984). The Second Circuit has articulated three rationales for awarding a plaintiff disgorgement of the defendant's profits: "(1) to avoid unjust enrichment; (2) as a proxy for plaintiff's actual damages; and (3) to deter infringement." *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 212 (2d Cir. 2019).

Records conceded during the bench trial that only the third rationale—deterrence—supports its claim for disgorgement here. *See* Tr. 1053:20-25. This rationale "focuses on the culpability of the willful infringer." *4 Pillar Dynasty LLC*, 933 F.3d at 213. The Second Circuit has also cautioned that "when relying on the deterrence rationale to support an award of an infringer's profits in the absence of any evidence of actual confusion, district courts should attend closely to the need to fashion a remedy that may sufficiently deter willful misconduct without giving plaintiffs a lottery-level windfall." *Id.* at 214.

Regardless of the rationale adopted, a district court must balance equitable factors in assessing the propriety of a profits award. "These include, but are not limited to: (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) any delay by plaintiff; and (5) plaintiff's clean (or unclean) hands." *Id.* Separately, the Supreme Court has clarified that "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 590

9

U.S. 212, 219 (2020). Choice of remedy under the Lanham Act is within the district court's discretion. *See 4 Pillar Dynasty LLC*, 933 F.3d at 214.

Records is not entitled to an award of Publishing's profits. To start, deterrence is a poor justification for disgorgement here. The risk of a "lottery-level windfall" looms large, given that Publishing's use of the mark long predates any infringing use. On top of that, Records has made at best a middling attempt to demonstrate that an award of profits is needed to deter Publishing from further use of Records' mark. This isn't a case where Publishing disregarded prior judicial orders or showed a blatant disregard for Records' clearly defined trademark rights. Rather, the record demonstrates that Publishing has used the Ultra name since the company's founding. *See* Tr. 201:8-10; 613:16-17. The parties' 2012 agreement, which even Sony's general counsel agreed wasn't a model of clarity, kicked the can down the road on Publishing's rights. *See* Tr. 1174:14-21. And no one cared much about Publishing's use of the Ultra mark for the next eight-plus years, even though the parties were contractually obligated to negotiate a license in good faith. When Records ultimately filed suit against Publishing, it didn't bother moving for a preliminary injunction or other interim relief, allowing Publishing to continue using the name while this case was pending. *See* Tr. 1065:23-1066:12. Plus there's no sign of "public fraud regarding the source and quality of consumer goods and services" so a profits award won't do much to "protect the public at large." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992).

Now for the five factors. First, it isn't certain that Publishing has benefited from its unauthorized use of the mark. Records relies heavily on one instance in which a Publishing employee supposedly attempted to divert sales from Records to Publishing. *See* DX-75; Tr. 1055:19-22. However, that email chain doesn't show what Records seems to think it does. Here's how the chain goes. A customer mistakenly reaches out to Publishing instead of Records, asking for options for an instrumental. *See* DX-75 at 1. A Publishing employee writes back five minutes later, responding that the customer's request should be directed to Records and providing the name and contact information for the Records contact. *See id.* Two days later, another Publishing employee responds to the email chain again and sends tracks from Publishing's rosters. *Id.* She writes that the tracks were "just for [the customer] to have on hand." *Id.*

Records focuses on the last email in the chain. But Records misses the forest for the trees. What the whole chain shows is that Publishing proactively directed a confused customer to Records and then only later offered its own services. This episode doesn't tip the scales in favor of a disgorgement of profits.

Records next points the Court to what it terms Publishing's use of "the imprimatur of the Ultra name." Tr. 1058:12-13. Here, Records argues that Publishing benefits by unlawfully tying itself to Records and thereby boosting its own brand. *See id.*

But there's little certainty about the benefit Publishing gains through its association with Records. Records hasn't furnished evidence that could help the Court distinguish between the benefits Publishing reaped through its own efforts and those Publishing supposedly gained through its association with Records. And for its part, Publishing has presented evidence that its profits are

10

due to its hard work. *See* DX-165; DX-165.1 (video of awards won by Publishing); Tr. 629:7-10 (witness testifying that "the name itself, frankly, had nothing to do with the fact that I signed with Ultra Publishing").

The timeline of events also undermines Records' request for disgorgement. Publishing has used the Ultra name for decades and long before the alleged disgorgement period, which commenced in March 2022. So Publishing didn't adopt the Ultra mark to capitalize on Records' brand. *See L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 367 (S.D.N.Y. 2010) (denying disgorgement remedy where defendant was a holdover licensee who continued to use the mark, the parties did not directly compete with one another, and defendant had not "committed any affirmative acts designed to deliberately deceive customers"); *cf. Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 466 (S.D.N.Y. 2017) (weighing factor in plaintiff's favor where defendant's "very business model depended on [imitating plaintiff's products to] creat[e] customer confusion and capitaliz[e] on [plaintiff's] goodwill").

On to the second factor. Here, Records agrees that an injunction is sufficient to prevent Publishing's use of the name going forward. *See* Tr. 1060:10-11; Dkt. 157 at 11. That concession knocks the legs out from underneath any deterrence-based argument. *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 485 (D.N.J. 2009) (injunctive relief and damages were adequate "without the exceptional remedy of disgorgement").

As part of its inquiry under the third factor, a court may look to a defendant's *mens rea*. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 2021 WL 1700695, at *4 (D. Conn. Apr. 29, 2021) ("This factor calls on the Court to examine the defendant's *mens rea* in engaging in the infringing activities."); *see also Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*, 570 F. Supp. 2d 498, 505 (E.D.N.Y. 2008) (discussing whether defendants were "well aware" and "directly responsible" for the infringing acts).

Here, the Court is mindful that, for purposes of Records' unfair-competition claim under New York law, the jury found that Publishing acted in bad faith by continuing to use the Ultra name after March 2022. *See* Dkt. 197, Q.3. But there are degrees of bad faith, and the Court considers the jury's finding against the backdrop of the entire record, which includes Publishing's uninterrupted use of the Ultra name for decades, the lack of clarity in the parties' contracts, and their mutual failure to negotiate a written license. The court's observation from an earlier Lanham Act case rings true here: "[O]ne cannot isolate the jury's finding . . . from the broader context of this case: endless sparring and protracted litigation by belligerent parties who insist in couching in one-sided fashion what to any outsider appear to be multifaceted disagreements for which both sides bear blame . . . ." *Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 102-03 (S.D.N.Y. 1998), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

The final two factors—plaintiff's delay and plaintiff's clean or unclean hands—are a wash. Call it delay or unclean hands, both parties are responsible for the many years in which no formal

11

license was negotiated. And thanks to that mutual inaction, the parties have now spent the last two years duking things out in federal court.[3]

## IV. The Court enters the following permanent injunction.

Having found that Records is entitled to a permanent injunction, the Court must also lay out the terms of such relief. "Although a district court has 'a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct,' it is nonetheless 'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'" *City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co., Inc.,* 124 F.3d 402, 406 (2d Cir. 1997)). The Second Circuit has "instructed that injunctive relief should be narrowly tailored to fit specific legal violations, and that the court must mould each decree to the necessities of the particular case." *Id.* (cleaned up). "An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *Id.* at 145.

The Court asked Records and Publishing to propose injunctions tailored to the infringement at issue here. *See* Dkts. 193, 194, 200-1. The Court declines to adopt either side's proposal in full. Instead, consistent with the jury's findings and the evidence presented at both phases of this trial, the Court will enter an order enjoining Publishing from market-facing use of the Ultra name, while providing appropriate lead time for Publishing to make the necessary modifications to its business practices. Further, the Court has endeavored to preserve Publishing's ability to use the Ultra name in certain areas where a change may cause unwarranted disruptions to Publishing's business.

The Court has balanced all of the considerations addressed in this opinion, including the jury's findings and evidence supporting Records' entitlement to relief; the parties' long-term relationship and decades of Publishing's authorized use of the Ultra name; Records' decision not to seek preliminary injunctive relief, which suggests a lack of urgency in implementation of any injunction order; and potential unintended harm to Publishing and its constituents in a broader or more immediate injunction. Here's the injunction:

> It is hereby ORDERED that Defendant Ultra International Music Publishing, LLC ("Defendant" or "Publishing"), its officers, agents, servants, employees, attorneys, successors or assigns, and all persons or entities acting in concert or participation with them or any of

---

[3] Because the Court finds that Records isn't entitled to an accounting of Publishing's profits, it doesn't have to get into how, if at all, Publishing's costs should be deducted from its profits. During the bench trial, both sides put up experts on how Publishing ought to have accounted for expenses incurred over the infringing period. Under the method Publishing actually used, Publishing had no profits over the infringing period. *See* Tr. 1104:10-1105:5; 1099:14-17. Records' expert challenged this method, Tr. 1247:17-18, and Records insists that Publishing should have to disgorge around $14 million. *See* Tr. 1092:13-1093:13. Suffice it to say that if the Court did reach the question, it would find that kind of profit recovery plainly "excessive." 15 U.S.C. § 1117(a).

them, are hereby permanently enjoined and restrained from using, in connection with the offer for sale, sale, distribution, marketing, advertising and/or promotion of any music-publishing or music-related goods or services (including on websites, social media platforms, or other media), the term "Ultra"; and

It is further ORDERED that above paragraph shall take effect no later than 5:00 p.m. EDT one hundred and eighty (180) days after the entry of this Order, except as set forth below in the following paragraph.

It is further ORDERED that Defendant may:

A. use and maintain the "ultrapublishing.com" domain name until 5:00 p.m. EST on the date that is one year after the entry of this Order, but, after 5:00 p.m. EDT on the date that is one hundred and eighty (180) days after entry of this Order, only in a manner that automatically redirects users who enter that domain name into their web browsers to a new website with a different domain name that is compliant with this Order.

B. include the words "formerly known as Ultra International Music Publishing" on the profile pages of all of Defendant's social media feeds until 5:00 p.m. EST on the date that is eighteen months after the entry of this Order, provided that such words do not appear in a prominent manner.

C. be referred to as "Ultra International Music Publishing" or any other names containing the word "Ultra" (other than "Ultra Records") on physical sound recordings manufactured before the date that is one hundred and eighty (180) days after entry of this Order, even if not shipped until after such date.

D. be referred to as "Ultra International Music Publishing" or any other names containing the word "Ultra" (other than "Ultra Records") on cue sheets filed with third parties in connection with licenses executed before the date that is one hundred and eighty (180) days after entry of this Order, even if such cue sheets are not filed until after such date.

It is further ORDERED that Defendant shall file with the Court and serve on counsel for Plaintiff, within thirty (30) days of September 12, 2025, March 12, 2026, and September 12, 2026 sworn written statements as provided in 15 U.S.C. § 1116.

    This Court shall retain jurisdiction over this action for the purpose of implementing, modifying, and enforcing this permanent injunction.

SO ORDERED.

Dated: February 25, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge